UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\*\*\*

UNITED STATES OF AMERICA,

            Plaintiff,

vs.

JEREMY HALGAT, *et al.*,

            Defendants.

2:13–cr–241–APG–VCF

**ORDER AND**
**REPORT & RECOMMENDATION**

      This matter involves Jeremy Halgat's alleged conspiracy to possess cocaine with intent to distribute in violation of 21 § U.S.C. 846(a)(1), (b)(1)(C) and 21 § U.S.C. 841(a)(1), (b)(1)(C). (*See* Indict. #1[1]). Before the court is Halgat's motion to dismiss for outrageous government conduct (#59) and supplement (#93). In response, the government filed a motion to strike (#64), an opposition (#103), and a motion for leave to file an opposition exceeding thirty pages (#102). Also before the court are the parties' stipulations to extend time to file an opposition (#97) and file a reply (#107).

      For the reasons stated below, the court denies the government's motion to strike (#64), grants the parties' stipulation to extend time to file an opposition (#97), vacates the court's July 23, 2014 hearing (#106), denies the parties' stipulation to extend time to file a reply (#107), and recommends granting Halgat's motion to dismiss.

**BACKGROUND**

      The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began Operation Pure Luck in 2010. The target: Vagos Motorcycle Club, an international "brotherhood" and "outlaw motorcycle

---

[1] Parenthetical citations refer to the court's docket.

gang"[2] suspected of trafficking drugs and firearms. The investigation culminated in twenty-five arrests and a score of indictments. Now, one of Vagos' former members, Defendant Jeremy Halgat, moves to dismiss the two indictments against him.[3] He argues, *inter alia*,[4] that this indictment is the product of "outrageous government conduct." This requires the court to examine "the totality of the circumstances." *United States v. Black*, 733 F.3d 293, 304 n. 7 (9th Cir. 2013). The circumstances, as reflected by the record, are discussed below.

## I.       The ATF Surveils & Infiltrates Vagos

Operation Pure Luck began with a stroke of luck: in April 2010, a fully "patched"[5] Vagos member unexpectedly agreed to act as a confidential informant for the ATF. Initially, the ATF limited the confidential informant's duties to covert surveillance. For instance, the confidential informant reported that the Las Vegas chapter of Vagos rode from Las Vegas to Mexicali, Mexico to celebrate Vagos' anniversary on February 18, 2011. (*See* Ex. 1 (#59-1) at ROI 16). Both Jeremy "Maniac" Halgat and the confidential informant attended the event.

The gang stopped at the border in Calexico, California to store weapons at "Crazy George" Marshall's home. (*Id.*) Someone deposited a large knife; but the confidential informant did not see any firearms. (*Id.*) Once in Mexicali, the confidential informant—who speaks fluent Spanish—facilitated

---

[2] The term, "outlaw motorcycle gang," does not denote criminal activity; it indicates that the club is not sanctioned by the American Motorcyclist Association and does not adhere to the AMA's rules and bylaws. *See* William L. Dulaney, *A Brief History of Outlaw Motorcycle Clubs*, INT'L J. OF MOTORCYCLE STUDIES (Nov. 2005), available at: http://ijms.nova.edu/November2005/IJMS_Artcl.Dulaney.html.
[3] The second indictment against Halgat charges him for his involvement in separate drug transaction. *See Unites States v. Halgat*, No. 13–cr–239–JAD–PAL (D. Nev. 2013). *See infra* § V at pp. 14–15.
[4] Alternatively, Halgat argues the court should (1) dismiss the action pursuant to the court's supervisory powers or (2) suppress all audio files and reports of investigation due to the government's falsification of reports. (*See* Doc. #59 at 26:13, 30:22). Given the recommendation that Halgat's motion to dismiss for outrageous government conduct be granted, the court does not reach these questions.
[5] Motorcycle patches are the primary means of displaying membership in and/or allegiance to a motorcycle club. *See, e.g.*, Dulaney, *supra*, note 3.

2

eight drug transactions and observed several Vagos members using the drugs he purchased. (*Id.*) But, Halgat—who had no criminal record and had never been arrested—abstained. (*See id.*)

Two days later, on February 20, 2011, the gang headed home to Las Vegas. (*Id.*) They stopped by Marshall's home to retrieve their weapons. (*Id.*) The confidential informant observed Craig "Watchdog" Martin retrieve a firearm; but he did not see Halgat do anything suspicious or illegal. (*See id.*) The gang returned to Las Vegas, ending the ride without incident.

Six months later, in the fall of 2011, the confidential informant's role changed. Rather than merely surveilling the group, he was now tasked with helping ATF Task Force Officer Agostino Brancato infiltrate the group. (*See* Def.'s Mot. to Compel (#38) at 3:18–19) (citing ROI 48). The confidential informant began by introducing Brancato to his Vagos confederates. This included Halgat.

At the time, Halgat was the Vagos Vegas Valley Vice President and Southern Nevada Regional Sergeant at Arms. (Ex. 5 (#59-5) at ROI 156). Brancato repeatedly noted Halgat's leadership status at the beginning of his reports. (*See* Ex. 2 (#44-2) at ROI 169); (Ex. 3 (#44-3) at ROI 171); (Ex. 4 (#44-4) at ROI 181). The confidential informant vouched for Brancato because both Brancato and the informant came from the same neighborhood. (Doc. #38 at 3:18–19). The ruse worked. Between October of 2011 and November of 2011, Brancato joined Vagos members at local bars and attended meetings at the Vegas Valley Vagos Clubhouse in Henderson alongside Halgat.

On November 17, 2011, Brancato's association with Vagos became official. (Ex. 2 (#59-2) at ROI 48). With the confidential informant's assistance, Brancato submitted a completed "Hangaround" application, became a Vagos "Prospect" (i.e., a six-month probationary member), and received a denim Vagos vest and motorcycle patch. (*Id.*)

Brancato, the confidential informant, and other Vagos members then went to Bailey's Bar in North Las Vegas and met Robert "Mayhem" Coleman, Halgat, and others. (*Id.*) At one point, Brancato

3

heard Coleman say, "I want to go to the Stadium Bar for a twenty sack."[6] (*Id.*) The evening soon ended. Brancato did not observe Halgat do anything suspicious or illegal. (*See id.*)

## II.    Brancato Befriends Halgat

Brancato's involvement with Vagos continued. While hanging out at the Henderson clubhouse, Brancato witnessed a cocaine transaction on December 9, 2011. (Ex. 1 (#103-1) at ROI 52). Halgat asked everyone in the clubhouse if they had cocaine. (*Id.*) When they said no, Sean "Tugboat" Valdez asked Halgat, "How much do you want, an eight ball?"[7] (*Id.*) Halgat nodded affirmatively. (*Id.*)

Valdez made a phone call; a delivery was made; and soon Halgat was dividing a white powdery substance into long thin lines for the gang's personal use. (*Id.*) Valdez rolled some money into a cylindrical tube, and Halgat, Valdez, and others snorted the substance in front of Brancato throughout the night. (*Id.*) At 9:00 p.m., Brancato left. (*Id.*)

Months later, on May 10, 2012, Halgat called Brancato to see what he was doing. (Ex. 2 (#103-2) at ROI 119). Because Brancato was on leave, he invented a cover story. (*Id.*) Brancato said that he was in Oklahoma "doing [drug] a run" for a Mexican cartel, and had been robbed. (*Id.*) Halgat worried. He told Brancato that the Vegas Valley Sergeant at Arms "Dog" was in Tulsa and could provide protection. (*Id.*) Halgat forwarded Dog's phone number and texted Brancato twelve times over the next four days to see if Brancato was safe. (*Id.*)

Halgat met with Brancato as soon as he returned to Las Vegas. (*Id.*) The pair had dinner, Brancato told Halgat about the fictitious robbery and, in response, Halgat told Brancato that he too had once been robbed while trafficking $35,000 of marijuana. (*Id.*) Halgat also related two "close calls" he once had with law enforcement. On one occasion, Halgat drove a "load car" filled with narcotics. (*Id.*)

---

[6] A "twenty sack" is slang for twenty dollars of cocaine, methamphetamine, or marijuana.
[7] An "eight ball" is an eighth of an ounce of cocaine. Possession of an eighth of an ounce of cocaine is punishable by one year imprisonment and a $1,000.00 fine. *See* 21 U.S.C. § 844.

On another occasion, he rode in the back seat with "a crate of grenades between his legs." (*Id.*) During the latter incident, the Mexican Border Patrol allegedly searched Halgat's vehicle but missed the crate between Halgat's legs. (*Id.*)

Halgat was still concerned about Brancato's fictitious robbery eight days later. (*See* Ex. 3 (#103-3) at ROI 123). On May 18, 2012, Halgat, Brancato, the confidential informant, and other Vagos members assembled at Brancato's home for a meeting. (*Id.*) After briefly discussing outlaw motorcycle gang politics, Halgat turned to Brancato and asked, "So, what are we going to do?" (*Id.*) He was referring to Brancato's fictitious robbery. (*Id.*) Brancato replied: "What do you want to do about it?" (*Id.*) Brancato then stated that the robbery was part of "doing business" and that it is "being handled." (*Id.*)

Brancato changed the subject. He said that he knows east-coast narcotics buyers interesting in purchasing methamphetamine and firearms. (*Id.*) The group discussed the possibility of selling to Brancato's contacts for an hour. (*Id.*) When the meeting ended, Halgat and Brancato paused in Brancato's garage. Halgat told Brancato that he could be trusted for protection, saying, "I'm a good gun." (*Id.*) Brancato thanked him for the offer and Halgat left. (*Id.*)

## III.   **Brancato Initiates Illegal Transactions**

Two months later, in July 2012, Brancato became a fully patched member of the Vagos Motorcycle Club. (Gov't's Opp'n (#103) at 4:22–24). In the gang's eyes, this officially made Brancato a "brother." For the ATF, the meant that it had successfully infiltrated Vagos. At the same time, Brancato also became the Vagos Clark County Sergeant at Arms and initiated a series illegal drug and guns sales. (*Id.*) Operation Pure Luck was now two years old.

On July 5, 2012, Brancato began soliciting Halgat for illegal firearms.[8] On two separate occasions, Brancato asked Halgat to buy two semi-automatic Kalashnikov rifles. (Def.'s Mot. (#59) at 5:17–24). In response, Halgat—who had a concealed firearm permit—twice procured lawfully purchased and legally possessed firearms. (*Id.*) Then, Brancato allegedly solicited Halgat for a fully-automatic firearm. (*Id.*) In response, Halgat said that he did not possess fully automatic firearms and proceeded to explain the law governing fully automatic firearms, including the requirement that fully-automatic firearms be registered with the U.S. Department of Justice. (*Id.* at 6:1–4). Later, Brancato allegedly attempted to solicit Halgat for "crates of guns." (*Id.*) Halgat refused. (*Id.*)

On July 13, 2012, Brancato initiated an illegal steroid purchase from another Vagos member, "Uncle Tony" McCall. (Ex. 4 (#103-4) at ROI 152). Brancato met McCall at the Dew Drop Inn, carrying $340.00 in ATF cashier funds. (*Id.*) McCall took the money, and stated that Brancato would have the steroids in a week. (*Id.*) On July 26, the steroids arrived. (*Id.*) McCall delivered the drugs at Brancato's house, told him to inject the drugs into his buttocks on a weekly basis, and provided handwritten instructions. (*Id.*) The two then discussed work out routines and McCall told Brancato to go straight to "Doobie [next time] so I don't have to drive all over town." (*Id.*)

On August 10, 2012, Brancato initiated another illegal transaction. This time, Brancato solicited cocaine from Halgat. Brancato had only seen Halgat buy an eighth of an ounce of cocaine for personal use one time. Nonetheless, Brancato now solicited Halgat to traffic a quarter pound of cocaine. Brancato wore a wire. The conversation follows:

| | |
|---|---|
| Brancato: | Y'all do bigger? |
| Halgat: | [*Laugh*] |
| Brancato: | Because I'm gonna be on the road next week, anyway, homey. |

---

[8] Neither party produced a Report of Investigation evidencing these transactions. However, the government's opposition concedes that they occurred. (*See* Gov't's Opp'n (#103) at 36:5–6) (stating that "there is no contested issue of fact" before the court).

| | | |
|---|---|---|
| Halgat: | How big? |
| Brancato: | QP [i.e., a quarter pound of cocaine]. |
| Halgat: | Honest, that'll be a problem. |
| Brancato: | Can you hook it up? |
| Halgat: | Much, much higher than that – see that's why I was asking before cause – I got like fucking three of those guys in town but it's fucking – |
| Brancato: | So what's the problem? Hey, hey – homey, we don't make enough – we make it all at once, you know what I mean? |
| Halgat: | Yeah. |
| Brancato: | Can you do QP? |
| Halgat: | Be safe. Don't fuck with fucking old school [*unintelligible*]. |
| Brancato: | Yeah, but, you know what, homey, sometimes you have to take a risk, you know. Times are hard right now, homey. |
| Halgat: | Well, I can fucking [*whistling sound*]. |
| Brancato: | Times are hard for everybody. |
| Halgat: | I can [*whistling sound*]. |
| Brancato: | Yeah, but as long as, you know, and if they don't know and— |
| Halgat: | I'll just— |
| Brancato: | —and for me, right now, it's worth the risk. |
| Halgat: | Damn. |
| Brancato: | And for everybody, you know, everybody's hurting. |
| Halgat: | Yeah? |
| Brancato: | Can we do something? |
| Halgat: | [*unintelligible*] |
| Brancato: | Alright, we'll talk. |
| | [*Sound of a motorcycle engine*] |
| Halgat: | Hey, I got it. |

(Doc. #59 at 6:5–12) (citing Tr. (#60-9) at 2–3).

Later that evening Brancato contacted Halgat again about buying cocaine. (*Id.* at 6:13–14).

Halgat again stated that he would not assist Brancato, stating:

| | | |
|---|---|---|
| Halgat: | You know how they are, everybody knows everybody, and then it's gonna come back. Oh, someone's buying that in Vegas. Fuck this thing. |
| Brancato: | But there's people right here. |
| Halgat : | Yeah, I know. |
| Brancato: | I mean – |
| Halgat : | I know. |
| Brancato: | But, there's people right here, dude. |
| Halgat: | But the thing is, is I don't know the extent – QP's big. |

7

| | |
|---|---|
| Brancato: | Then something's wrong. I'm not trying to be – hey I'm not trying to be Hugh Hefner bro, I just want to get, you know, a little meat on the bone for everybody, because I'll make it on the other end,[9] you know – my idea was, you know – |
| Halgat : | I know. |
| Brancato: | Couple bricks, and, shew. |
| Halgat : | I know, but then [*whistling sound*]. |
| Brancato: | With the law bro? |

(Ex. E (#60-10) at 1–2). Halgat continued: "It's been a long time since I fucked with a bundle. [*whistling sound*]." (*Id.* at 3).

Despite Halgat's refusal to traffic a quarter pound of cocaine with his "brother," Brancato continued to solicit Halgat by explaining exactly how Brancato would structure the transaction. Halgat responded by expressly refusing Brancato's advances and telling Brancato that all he will do is introduce Brancato to a third party: Udell Wickham, a Mongols Motorcycle Gang "Hangaround," who was not part of Halgat's organization. Halgat also asked Brancato to acknowledge Halgat's refusal to traffic cocaine and stated that he had already decided to voluntarily withdraw himself from the drug trade. The conversation follows:

| | |
|---|---|
| Brancato: | Either way, these dudes probably buy a QP at a time, or a half a pound. |
| Halgat : | Yeah, but can we – |
| Brancato: | I know, but if I – this is the way I look at it, tell me if I'm wrong. You get it and you make yours, you give it to me. You get it from them, you give it to me and make yours, and I'm gonna make mine on the other end, because there's a lot of – that way there's more meat on the bone. Just like with the other thing, anything you do, you're gonna know, flat out. This is exactly what we paid for it, that's all, what we make is what we make. |
| Halgat: | And that's fine, bro, because and – like to me it's more, you know, [*unintelligible*] have friends, the way I run everybody's – cause the lawyer this and that, I need it bro. |
| Brancato: | I know it, bro, but I'm going down there anyway. It's hard for me to turn down, you know, a little bit of meat on the bones, and if everybody's happy, and everybody makes a little bit, then that's |

---

[9] "Make it on the other end" refers to profits from the sale of the cocaine following the initial purchase.

8

|  |  |  |
|---|---|---|
|  |  | good for me, and I feel good about myself, and then they're really happy over there. |
| Halgat: | | I just had this conversation at length. I just had this conversation, and there is nothing good. I said, okay, just help me out a bit, and they told me there's nothing, there's nothing there. |
| Brancato: | | I had the same – right – |
| Halgat: | | I think there is, but it's not organized, like it used to be, you know. Well I need this and I need that, and I'd fuckin go to Dallas. See look, I did this for a long time, and I used up all my luck. I know that for a fact, so the only thing I can contribute is, hey this is my home boy [Wickham], I trust him. This is my home boy, I trust him, whatever you do, and if it fucks up – |
| Brancato: | | Uh-huh. |
| Halgat : | | It's trust – understand. |
| Brancato: | | No that's it – yeah, and that's alright. Huh? |
| Halgat : | | Acknowledge. |
| Brancato: | | Yeah. |
| Halgat : | | I can't – |
| Brancato: | | Bro, I understand. |
| Halgat : | | I can't fucking, I can't help – |

(Ex. E (#60-10) at 5–6).

Brancato did not stop. He told Halgat that he wanted the transaction to be "done the familia way" so that everyone is involved. (Ex. E (#60-10) at 6). Halgat refused. Once again, he relied on mistakes he made in his past to avoid becoming involved with the drug trade in the future: "I had a wakeup call one day, and these cats all be hardcore, a friendship like that – they all older cats, they could use me, like a pistol. [*Inaudible*] something I did with them – I didn't really like it, like a bomb, doing their shit, they wouldn't do any of that shit themselves." (*Id.*)

Despite Halgat's refusal to traffic large quantities of cocaine, he purchased an unknown amount from Wickham on the same night, again for personal use. The next day, on August 11, 2012, Brancato accompanied Halgat and other members of the Vagos gang to the Double Diamond Tavern, Cheyenne Saloon, and Babes. (Ex. 5 (#103-5) at ROI 154). Over the course of the evening, Brancato heard several Vagos members discuss tracking drugs. (*See id.*) Halgat did not. (*Id.*)

As the evening ended, Halgat and Brancato exited Babes. (*Id.*) Halgat removed a zip-lock bag from his right sock. (*Id.*) Brancato reported that the bag appeared to contain the cocaine that Halgat bought from Wickham for personal use. (*Id.*) Halgat placed some cocaine in a one dollar bill, gave it to the Vagos Vegas Valley Chapter President, "Big Steve" Carr, and told Brancato: "That's the same sack from last night, six people hit it and I been passing it out, and there still is a lot left." (*Id.*) This marked the second time in three years that the ATF observed Halgat use cocaine.

## IV.   **Halgat Capitulates**

Brancato overcame Halgat's refusal to traffic cocaine five weeks later. With Halgat's help, Wickham and Brancato completed four cocaine transactions that resulted in Halgat's arrest and indictment. Each transaction is discussed below.

### A.   *The First Transaction*

Brancato initiated the first cocaine transaction on September 19, 2012. (Ex. 5 (#59-4) at ROI 165). Brancato sent a text, and Halgat agreed to meet at Brancato's home to discuss buying cocaine from Wickham. (*Id.*) At 12:45 p.m., Halgat arrived, and took a seat at Brancato's kitchen table as the pair reviewed their options. (*Id.*) Previously, Brancato stated that he wanted to advance Wickham $2,800.00 for a quarter pound of cocaine. (*Id.*) Now, Brancato inquired whether Wickham would sell a smaller amount of cocaine without requiring prepayment. (*Id.*)

Halgat relayed Brancato's question via text. Wickham responded, and offered to sell one ounce of cocaine for $800.00 the same day after 6:00 p.m. (*Id.*) Brancato agreed; and Halgat relayed Brancato's acceptance via text. (*Id.*)

At 6:30 p.m., Brancato and Halgat reconvened and drove to a local Hooters Restaurant. (*Id.*) While driving, Brancato gave Halgat $800.00, which Halgat put in his left pocket. (*Id.*) When they arrived, Wickham, and another member of the Mongol gang, K.A., were waiting outside. (*Id.*) Halgat

and Brancato walked passed Wickham and K.A., entered the restaurant, and ordered food and drinks. Wickham followed, and joined Brancato and Halgat at the table while K.A. looked on from the bar. (*Id.*)

The trio discussed buying a quarter pound of cocaine from an undisclosed seller. (*Id.*) Wickham advised against any transaction involving prepayment. (*Id.*) Brancato's Report of Investigation details the remainder of the evening as follows. Wickham turned to the transaction at hand, stating: "I'll give you this one [ounce] for $700.00. Where do want to do it at, the baño?"[10] (*Id.*) Halgat said, "Yes;" and returned $100.00 to Brancato, saying: "Here, you can pay for dinner." (*Id.*) Halgat and Wickham left for the restroom. (*Id.*) K.A. remained at the bar, watching. (*Id.*)

Shortly after Halgat returned, he and Brancato exited the restaurant. (*Id.*) Once they were back inside Brancato's car, Halgat reached into his left pocket and handed Brancato a purple Crown Royal bag. (*Id.*) Brancato offered Halgat $50.00 for brokering the transaction; but he refused, saying: "Don't worry about it, you paid for my dinner and you can just get me on the back end." (*Id.*)[11]

Brancato weighed the contents of the Crown Royal bag as soon as they arrived back at Brancato's residence. (*Id.*) The bag contained 29 grams of cocaine. (*Id.*) Halgat said that he would tell Wickham that it was exactly one ounce.[12] (*Id.*)

Later that evening, Brancato debriefed with his superiors over the phone. (*See* Ex. 4 (#59-3) at 6). Brancato expressed surprise at Halgat's refusal to accept $50.00 for brokering the transaction and then described how he intended to structure future transactions in order to implicate Halgat:

> You know what? I may do this is what I'm thinking. Like as far as I'm concerned fucking Maniac [i.e., Halgat] sold me this fucking ounce, bro. I mean, really. Yeah. Well, that's

---

[10] Brancato's Report of Investigation for the evening emphasizes that $700.00 would be the price per ounce for a quarter pound of cocaine, totaling $2,800.00.

[11] Brancato allegedly attempted to pay Halgat for brokering the transaction on five separate occasions. Each time, Halgat allegedly refused Brancato's payments until Brancato insisted, saying: "just to make me feel better" and "at least you have something for the weekend." (*See* Doc. #59 at 6:16–21).

[12] There are 28.3495 grams in 1 ounce.

> what I'm thinking. Well, this is what I'm thinking, bro is that on the QP, we do it the same way, let Maniac [–] I give Maniac the money, he goes in there, brings it back to me da, da, da. And then on the next one, I'm like hey, bro, can I just go to him direct and I'll still give you the money and now I have a sale of QP with him. You know what I'm saying? With Udell without him so now, he owns one and then this guy and Maniac owns one. [¶] Well, alright, so we may need a little bit more. We maybe have to do a little bit more. That's, which is perfect. Yup.

(*Id.*)

During the call, Brancato also stated that he would fabricate the portion of his Report of Investigation regarding the operation's debriefing:

> All right, bro. I'm just putting it in the mailbox right now. All right, and then there's $300 and everything else in there. [. . .] Bro, I'm just going to say I'm not going to tell them how. I just did it like last time. I just transferred, yeah. I'm not going to put the whole mailbox thing bro, fuck it. They don't need to [know], I mean that's irrelevant. I just gained[,] I met you at a disclosed fucking location and gave you the evidence during the debriefing. Fuck it. Just that would muddy the waters up so.

(*Id.* at 7, 8). Paragraph 8 of Brancato's Report of Investigation reads: "At approximately 2025 hours, TFO Brancato debriefed the undercover operation with Case Agents SA Wear and TFO Aboreen [*sic*] at an undisclosed location. TFO Brancato transferred custody of the purple "Crown Royal" bag containing a clear plastic bag and the purported cocaine to TFO Arboreen. TFO Brancato also returned three hundred dollars of the unused ATF buy money to SA Wear." (*See* Ex. 5 (#59-4) at 4).

**B.    *The Second Transaction***

On October 9, 2012, Brancato initiated a second transaction. (*See* Ex. 2 (#44-2) at ROI 169). The Las Vegas chapter of the Vagos Motorcycle Club were meeting at Brancato's home for a President's meeting. (*Id.*) After it ended, Brancato approached Halgat. He wanted more cocaine. Brancato said that he hoped to buy a quarter pound from Wickham, but would take "whatever amount of powder cocaine Wickham currently possessed." (*Id.*)

Halgat does not appear to have immediately respond. (*See id.*) The next day, on October 10, 2012, Brancato texted Halgat, asking: "Carnale. . . Any good news from home Boy. . . ?" (*Id.*) Halgat replied: "I'm waiting for an answer." (*Id.*) After several messages were exchanged, Halgat informed Brancato that Wickham would sell an ounce, not a quarter pound. (*See id.*) "Perfecto effe. . .!," Brancato replied. (*Id.*)

Brancato, Halgat, and Wickham met the following day at a Michaels Pub in Las Vegas. (*Id.*) When Wickham arrived, Brancato and Halgat were waiting at a table. Wickham sat down, turned to Halgat, and asked: "Who [do] you want me to hand it to?" (*Id.*) Halgat told Wickham to hand the cocaine to Brancato. (*Id.*) Wickham complied, and gave Brancato a clear plastic bag. Halgat handed Wickham $700.00, which Brancato had given him on the ride over. (*Id.*)

After the transaction was complete, Wickham explained that he wanted to limit future sales to one ounce because it is more profitable and the punishment is less severe, in the event that he is arrested. (*Id.*) Wickham then told Brancato directly: "If you want to do another one tomorrow, we can." (*Id.*) Brancato agreed.

After the trio left Michaels Pub, Halgat, Brancato, and other members of the Vagos gang met for a meeting where they discussed local motorcycle gang politics. (*Id.*) In response to news of another gang's local activates, Halgat suggested that the situation could turn violent. (*Id.*) A Utah-based motorcycle gang had been seen wearing Vago's color, green, while riding in Las Vegas. (*Id.*) Brancato completed a Report of Investigation detailing these facts sometime later. (*Id.*)

## C.  *The Third Transaction*

Wickham, Halgat, and Brancato met the next day for a third transaction. (*See* Ex. 3 (#44-3) at ROI 171). Like the previous day's transaction, they met at Michael's Pub. (*Id.*) Also like the previous

13

transaction, Wickham handed cocaine to Brancato, at which point Halgat handed $700.00 to Wickham, which Brancato had given to Halgat as Brancato drove Halgat to the pub. (*Id.*)

Once the transaction was complete, Brancato told Wickham directly that he wanted to do a fourth transaction the following week. (*Id.*) Wickham requested one day's notice. (*Id.*) As Halgat and Brancato drove away, Brancato gave Halgat $150.00 for brokering the transaction. (*Id.*) Sometime later, Brancato completed another Report of Investigation. (*Id.*)

### D.    *The Fourth Transaction*

Brancato initiated a fourth transaction on October 22, 2012. (*See* Ex. 4 (#44-4) at ROI 181). Again, Brancato met Halgat at Halgat's home, gave him $700.00, and drove to Michael's Pub. (*Id.*) As they drove, Halgat discussed a trip he planned to take to Ogen, Utah to purchase Kalashnikov rifles. (*Id.*)

Shortly after arriving at the pub, Brancato and Halgat were met my Wickham and his wife. (*Id.*) While waiting for their food, Halgat placed Brancato's money into an empty cigarette box and slide it across the table to Wickham. (*Id.*) Wickham removed the money, inserted a plastic bag, and slide the cigarette box back across the table to Halgat. (*Id.*) After the meal was over, Halgat gave the cigarette box containing the cocaine to Brancato. (*Id.*) Again, Brancato subsequently completed a Report of Investigation. (*Id.*)

## V.    The ATF Initiates a Reverse-Sting Operation[13]

One month later, Brancato asked Halgat to "watch his back" to prevent Brancato from "end[ing] up in a barrel." (Doc. #59 at 6:22–23). The ATF had invented a bogus drug transaction involving an airplane, ten kilograms of cocaine, and Brancato's fictitious role as a drug courier for a Mexican cartel. (*Id.*) Brancato stated that he needed "a hired gun." (Ex. 6 (#103-6) ROI 217 at ¶ 4). He wanted Halgat's

---

[13] "A 'reverse sting' occurs when the government initiates the criminal conduct, setting up a fictitious crime and arresting the criminals as they begin to carry out what they believe is a real crime." *United States v. Black*, 733 F.3d 294, 298 (9th Cir. 2013).

protection and encouraged him to bring his guns to protect Brancato from nonexistent threats. (*See id.*)

The bogus drug deal occurred on March 2, 2013. (*Id.* at 7:15); (Ex. 6 (#103-6) at ROI 222). The ATF took ten kilograms of cocaine from its own supply of contraband, rented an airplane, and flew it to Searchlight, Nevada. (Ex. 6 (#103-6) ROI 222 at 4). A government agent exited the airplane carrying the government's cocaine and handed it to Brancato. (*Id.*) Meanwhile, Halgat looked down a nearby roadway. (Doc. #59 at 6:22–23). A gun was either in his hands or resting on the ground nearby when the transfer occurred. (*See id.*) (stating that Halgat was not holding a gun when the transfer occurred); (*but see* Ex. 6 (#103-6) ROI 222 at 4) (stating that Halgat was holding a fun when the transfer occurred).

The airplane flew away; Brancato stored the cocaine in his truck; and everyone left. (Ex. 6 (#103-6) at ROI 222). Halgat never touched the cocaine and had no say in the amount that was transported. (*See id.*) Brancato paid Halgat $1,000.00 for his phony services. (*Id.*)

## VI.   Halgat is Arrested & Indicted

On June 19, 2013, Halgat was indicted in this action under 21 U.S.C. § 846 (i.e., conspiracy to possess cocaine with intent to distribute) in connection with the four cocaine transactions. One the same day, he was also indicted in a separate action, *Unites States v. Halgat*, No. 13–cr–239–JAD–PAL (D. Nev. 2013), under 21 U.S.C. § 841 (i.e., conspiracy to possess cocaine with intent to distribute) and 18 U.S.C. § 924(c)(1)(A) (i.e., using and carrying a firearm in relation to a drug trafficking crime) for participating in the ATF's bogus cocaine transaction involving the airplane.

A week later, while Halgat was in California, the ATF and Las Vegas Metropolitan Police Department executed search warrants at Halgat's home and workshop. (Doc. #59 at 8:4–9). Neither search produced anything illegal. (*Id.*) As soon as Halgat learned of the searches, he returned to Las Vegas and surrendered himself to the U.S. Marshalls. (*Id.*)

15

### DISCUSSION

Federal Rule of Criminal Procedure 12 governs pleadings and pretrial motions. Under Rule 12(b)(3)(A), a criminal defendant "must" move to dismiss the indictment before trial if there is an alleged "defect in instituting the prosecution." *See* FED. R. CRIM. P. 12(b)(3)(A). One potential defect includes what Halgat alleges here: that his constitutional rights will be violated if prosecution proceeds because the ATF engaged in "outrageous government conduct" while investigating him. *See United States v. Russell*, 411 U.S. 423 (1973); *United States v. Sotelo–Murillo*, 887 F.2d 176, 182 (9th Cir. 1989) (citing *United States v. Montilla*, 870 F.2d 549, 551 n.1 (9th Cir. 1989). The court begins its analysis of Halgat's motion by reviewing (1) the law governing outrageous government conduct and (2) recent cases involving the ATF and allegations of outrageous government conduct.

### I.   Outrageous Government Conduct

The Fifth Amendment's due process clause states, "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend V. In *United States v. Russell*, the Supreme Court stated that law enforcement officers may engage in conduct "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Russell*, 411 U.S. at 431–32; *see also Hampton v. United States*, 425 U.S. 484, 491–95 (1976). This dictum created the doctrine of outrageous government conduct.

The outrageous-government-conduct doctrine is designed to curb law enforcement and protect our constitutional values of equality, fairness, and liberty. *United States v. Black*, 750 F.3d 1053 (9th Cir. 2014) (Reinhardt, J., dissenting); *see also United States v. Hudson*, — F. Supp. 2d —, No. 2:13-cr-00126-ODW-3, 2014 WL 960860 (C.D. Cal. Mar. 10, 2014) (citing JAMES MADISON, THE FEDERALIST

NO. 51[14]). The doctrine admonishes the government to "[l]ead us not into temptation." *United States v. Black*, 733 F.3d 294, 313 (9th Cir. 2013) (Noonan, J., dissenting).

The doctrine prohibits the government from using "artifice to cause a crime, and to shape the nature and planning of that crime, while targeting people who are not already known to be involved in a continuing series of similar crimes." *Black*, 750 F.3d at 1059 (citing *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008); *United States v. Bonanno*, 852 F.2d 434, 437–38 (9th Cir. 1988)). Judicial scrutiny focuses on the government's actions—not the alleged actions of the criminal defendant. *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991). Generally, the government's involvement must (1) be *malum in se*, (2) "amount to the engineering and direction of the criminal enterprise from start to finish," or (3) be "so excessive, flagrant, scandalous, intolerable and offensive as to violate due process." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991); *United States v. Garza–Juarez*, 992 F.2d 896, 904 (9th Cir. 1993).

No bright line separates constitutional conduct from outrageous conduct. *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013). Each case must be resolved on its own facts. *Id.* In *Bonanno*, the Ninth Circuit expounded a multifactor inquiry. The court held that the government's conduct is permissible when:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in progress at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

*Bonanno*, 852 F.2d at 437–38.

---

[14] In FEDERALIST NO. 51, President Madison stated: "If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself."

In *Black*, the Ninth Circuit disavowed rigid application of the *Bonanno* test in favor of a totality-of-the-circumstances inquiry. *Black*, 733 F.3d at 304 n. 7 (rejecting the *Bonanno* factors as a "test"). Under *Black*, a court must consider:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

*Id.* at 303.

## II.   ATF & Outrageous Government Conduct

Two cases from the Central District of California recently found that the ATF engaged in outrageous government conduct. In *United States v. Hudson*, the ATF recruited "chronically unemployed individuals from poverty-ridden areas," invented a fictitious cocaine stash-house with 20 to 25 kilograms of cocaine, and asked the defendants if they had "a crew . . . a couple of other homies" that could participate in a robbery. *Hudson*, 2014 WL 960860, at *1. To ensure that the defendants would suffer harsher criminal penalties, the ATF agent also imagined up nonexistent guards and told the defendants to bring guns. *Id.* at 2. It worked. *Id.* at 3. The defendants followed the ATF agents to the stash-house and were arrested. *Id.*

The ATF initiated an identical cocaine transaction in *United States v. Joe Roberts*, No. 13–cr–751 at *1 (C.D. Cal. May 30, 2014). (*See* Ex. 7 (#93-1) at 1–3). In both cases, the court chastised the ATF—which has no authority over illicit drugs—for purporting to fight the war on drugs by subjecting the indigent to criminal prosecution while failing to remove an ounce of drugs from the streets. (*See id.* at 3:20–23) ("[W]as there any evidence that these arrests, as well as all other fake stash house robberies being used by the ATF to get firearm arrests, helped in any fashion the war on drugs?"). In *Hudson*, the

Honorable Otis D. Wright, II, U.S. District Court Judge stated:

> Everything about the scheme—and therefore almost everything bearing upon a defendant's ultimate sentence—hinges solely on the Government's whim. Why were there not 10 kilograms in the stash house? Or 100? Or 1,000? Why were the guards allegedly armed—necessitating that Defendants bring weapons along with them? All of these factors came down to the ATF and the undercover agent alone. That sort of arbitrariness offends the Constitution's due-process demands.

*Hudson*, 2014 WL 960860, at *11.

By contrast, in *Black*, the Ninth Circuit cautiously upheld the convictions of five defendants after the ATF executed an identical operation. *Black*, 733 F.3d at 298–300, 302–03. Writing for the court, Judge Fisher began by noting "two troubling aspects about this fictional sting and how it came about." *Id.* at 302. Regarding the first, Judge Fisher wrote:

> First is the fiction itself. The crimes of conviction—conspiracy to possess cocaine with intent to distribute and the use of firearms in furtherance of drug trafficking—resulted from an operation created and staged by ATF. . . . [The ATF] invented the scenario, including the need for weapons and for a crew, and the amount of cocaine involved. The only overt actions by the defendants involved showing up at meetings, including arriving at the parking lot with four hidden, loaded weapons and then driving to the storage warehouse where they were arrested. Although those actions clearly corroborate the defendants' intent to carry out an armed robbery, defendants were responding to the government's script.

*Id.* at 302–303. The second troubling aspect in *Black* was the ATF's indiscriminate dragnet: "ATF was not infiltrating a suspected crew of home invasion robbers, or seducing persons known to have actually engaged in such criminal behavior. Rather, ATF found Simpson by 'trolling for targets' . . . [among the] general[] population," and specifically the indigent. *Id.* at 303.

The court upheld the defendants' convictions after applying the *Black* factors. Judge Noonan authored a strong dissent, saying in part:

> Massively involved in the manufacture of the crime, the ATF's actions constitute conduct disgraceful to the federal government. It is not a function of our government to entice into criminal activity unsuspecting people engaged in lawful conduct; not a function to invent a fiction in order to bait a trap for the innocent; not a function to collect conspirators to

19

> carry out a script written by the government. As the executive branch of our government has failed to disavow this conduct, it becomes the duty of the judicial branch to refuse to accept these actions as legitimate elements of a criminal case in a federal court.

*Black*, 733 F.3d at 318.

Judge Noonan's dissent was joined by Judge Reinhardt and Judge Kozinski in their dissent from the Ninth Circuit's denial for an en banc rehearing. *Black*, 750 F.3d at 1053–1060. All three Judges criticized the majority for not applying the *Bonanno* test. *Black*, 733 F.3d at 315–16; *Black*, 750 F.3d at 1059. All three Judges also chastised the ATF for purporting to fight the war on drugs by inducing the indigent, and those who are merely susceptible to criminal behavior, into committing new crimes, which were not part of a continuing series of similar crimes committed by the defendants. *Id.* at 1058; *see also Black*, 733 F.3d at 317 (citing *United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012) (Posner, J., dissenting) (discussing the ATF's sting operations)).

## III.   Whether the ATF Violated Halgat's Due Process Rights

Before applying the *Black* factors, the court follows Judge Fisher's opinion in *Black* and notes aspects of the ATF's investigation that are troubling.

### A.   *Troubling Aspects of the ATF's Investigation*

There are three troubling aspects of the ATF's investigation. The first is the most concerning: Halgat's expressed "wakeup call" and disavowal of drug trafficking. The ATF's investigation into Halgat began in April 2010. Over two years later, the ATF's investigation yielded the following facts: Halgat once trafficked drugs but since repudiated the practice. Halgat's rejection of the drug trade was unequivocal. Halgat responded to the ATF's invitation to traffic cocaine, saying: "I can't. . . I can't fucking, I can't help." (Ex. E. (#60-10) at 6).

When Agent Brancato refused to accept Halgat's rejection, Halgat told Brancato to "acknowledge" his rejection. (*Id.*) Brancato responded, "Yeah." But, Brancato did not stop. In response

to Brancato's continued insistence, Halgat said: (1) "[f]uck this thing; (2) "there is nothing good;" (3) "I used up all my luck;" (4) "the only thing I can contribute is [an introduction to a third party];" (5) "I can't;" (6) "I had a wakeup call one day;" (7) "something I did with them – I didn't really like it." (*Id.*)

Criminal punishment has three justifications: deterrence, rehabilitation, and retribution. *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008). Rehabilitation and deterrence are notoriously difficult to accomplish—especially when cocaine is involved. Nonetheless, Halgat told the ATF that he rehabilitated himself and is deterred from trafficking drugs because of something in his past. Halgat even stated that he discussed trafficking drugs recently, presumably with another Vagos member, but refused: "I just had this conversation at length. I just had this conversation, and there is nothing good." (Ex. E. (#60-10) at 5). Then, the ATF engaged in conduct to make Halgat relapse. This raises serious questions: What principle will justify his punishment if he is convicted? Halgat was rehabilitated and deterred. Is the government merely seeking retribution for a crime it designed and initiated?

Second, the court is disturbed by the ATF's statement that it falsified reports to avoid "muddy[ing] the waters up." There is no doubt that portions of Brancato's Report of Investigation detailing the first transaction were falsified.[15] Brancato said, "fuck it" to the formalities, "[t]hey don't need to know. . . [I'll just write] I met you at a disclosed fucking location and gave you the evidence during debriefing. Fuck it." (Ex. 4 (#59-3) at 7–8). Brancato's superiors did not dissuade him: Brancato

---

[15] The government argues that reports were not falsified. In support, it provides an affidavit by Brancato, which reads in part: "I have never falsified any reports. [. . .] [I]n my reports[,] I was purposely vague" to "protect investigation techniques." (*See* Ex. 9 (#103-9) at ¶ 3, 5). This is unpersuasive. The report is clear, not vague. Additionally, Reports of Investigation are written for the agents' supervisors, not the public. Brancato's purported need to keep his reports "vague" to protect something his supervisors already new is not credible. The government's argument that the report is a "summary," which cannot account for every detail of the debriefing is equally unpersuasive. (*See* Gov't's Opp'n (#103) at 26:22). The report is problematic, not because it omitted facts or "limited information disclosed," but because the facts it provides directly contradict what Brancato said. If the reports were written to "limit information disclosed," as the government argues, (*see id.* at 27 note 10)—or if "[t]hey don't need to know," as Brancato stated—then Brancato would have limited the information or not written anything regarding debriefing. However, the report did the opposite: it provided information about the debriefing that materially misrepresented the ATF's conduct during the investigation.

21

wrote and submitted a falsified report. (*See* Ex. 5 (#59-4) at ROI 165). This is distressing. Can the court rely on the chain of custody of evidence that the government will proffer against Halgat at trial? Did Brancato's supervisors permit other falsifications?

Third, it is troubling that the ATF investigated Halgat for three years, found no contraband after executing two search warrants, and indicted him for a crime designed and initiated by the ATF. Despite Halgat's sporadic use of an eighth of an ounce of cocaine, he had never been arrested, had no criminal record, disavowed drug trafficking, and voluntarily surrendered himself to the U.S. Marshalls. These facts indicate that Halgat's "wakeup call" was legitimate.

**B.**  ***Application of the* Black *Factors***

With these concerns in mind, the court turns to the six *Black* factors. Because only two of the factors favor the government, the court recommends granting Halgat's motion to dismiss. Each factor is discussed below.

**1.  The Defendant's Known Criminal Characteristics**

The first factor examines the defendant's known criminal characteristics. *Black*, 733 F.3d at 303. Here, the question is whether Halgat—who had no criminal record, had never been arrested, and had a concealed firearm permit—"had a criminal background or propensity the government knew about when it initiated its sting operation." *Id.* at 304–05 (citing *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008) (noting that before the government suggested a stash house robbery, the defendant was introduced to the government "as a middleman drug dealer"); *United States v. Mayer*, 503 F.3d 740, 754 (9th Cir. 2007) ("While Mayer points out there was no ongoing criminal enterprise that the government was merely trying to join, Mayer was certainly a willing and experienced participant in similar activities [traveling internationally for sex with boys].")

22

The government makes two arguments in support of its position that this factor weighs in its favor. The government first argues that "[w]hile Brancato may not have explicitly known Halgat's exact criminal propensity when he met Halgat, his Vagos membership signaled a propensity to engage in the types of crimes members of the organization were regularly involved in." (Gov't's Opp'n (#103) at 18:17–20). The government also argues that "Halgat made representations that he had engaged in similar criminal behavior in the past." (*Id.* at 18:20–21) (citing Gov't's Exs. 1–6).

The government's argument that Halgat engaged in similar criminal behavior in the past is unpersuasive. As previously discussed, Halgat repudiated his previous participation in the drug trade. His willingness to traffic drugs only reemerged after the ATF injected itself into Halgat's life and repeatedly solicited his services. The government's related argument—that the ATF knew Halgat's criminal propensities when it initiated the operation because Brancato observed Halgat using cocaine—is also unpersuasive. (Gov't's Opp'n (#103) at 5:2–20, 18:21). Cocaine use became a known criminal characteristic *after* the operation began. *Black*, 733 F.3d at 303 (stating that the characteristic must be known when the operation begins). Additionally, Brancato only observed Halgat buy an eighth of an ounce of cocaine for personal use twice in three years. Trafficking a quarter pound of cocaine with intent to distribute—the crime designed and initiated by the ATF—is wholly different.[16]

Nonetheless, this factor weighs in the government's favor because gang membership was a known criminal characteristic that warranted the government's investigation into Halgat when the operation began. In *Hudson*, the court stated that if government agents "at least had suspicion based on identifiable facts—then the Government should and does have free reign, consistent with constitutional restrictions." *Hudson*, 2014 WL 960860, at *7. Halgat's leadership role in Vagos satisfies this criterion.

---

[16] Possessing an eighth of an ounce of cocaine is punishable by one-year imprisonment and a $1,000.00 fine. *See* 21 U.S.C. § 844. Possessing a quarter-pound of cocaine with intent to distribute is punishable by up to twenty-years imprisonment and a maximum fine of $1,000,000.00 *See* 21 U.S.C. § 841.

23

### 2.   Individualized Suspicion of the Defendant

The second *Black* factor examines the government's individualized suspicion of the defendant. *Black*, 733 F.3d at 303. This factor is closely tied to the first. For the same reason stated above—(*viz.*, Halgat's membership in Vagos)—this factor weighs in the government's favor. *See Black*, 733 F.3d at 304 (citing *United States v. Luttrell*, 923 F.2d 764, 764 (9th Cir. 1991) ("The government need not have individualized suspicion of a defendant's wrongdoing before conducting an undercover investigation."). However, the four remaining factors favor Halgat.

### 3.   The Government's Role in Creating the Crime

The third factor considers the government's role in creating the crime. *Black*, 733 F.3d at 303. Here, the question "is whether the government approached the defendant initially or the defendant approached a government agent, and whether the government proposed the criminal enterprise or merely attached itself to one that was already established and ongoing." *Id.* at 305. The government argues that this factor militates in its favor because Halgat had "an independent role" in the crime: he introduced Brancato to Wickham, planned the criminal conduct, "responded eagerly to assist Brancato," and guided "Brancato through the entire cocaine purchase from start to finish." (Gov't's Opp'n (#103) at 20:7–13).

The government's position is not supported by the record. Halgat was not eager to participate in Brancato's scheme in any capacity. Before Halgat even offered to introduce Brancato to Wickham, Halgat emphatically rejected Brancato's advances, saying: (1) "Honest, that'll be a problem;" (2) "Be safe. Don't fucking with fucking old school [*unintelligible*];" (3) "Fuck this thing;" (4) "But, the thing is, is I don't know the extent – QP's big;" and (5) "I just had this conversation, and there is nothing good." When Halgat finally offered to make an introduction, he was reluctant: "See look, I did this for a long time, and I used up all my luck. I know that for a fact, so the only thing I can contribute is, hey this

24

is my home boy [Wickham]." This was followed by Halgat's statement, "I can't. . . I can't fucking – I can't help."

Similarly, there is no support in the record that Halgat planned the criminal conduct and guided Brancato through the entire cocaine purchase from start to finish. The entire transaction was Brancato's idea. On August 10, 2012, Brancato told Halgat how the transaction would occur:

> I know, but if I – this is the way I look at it, tell me if I'm wrong. You get it and you make yours, you give it to me. You get it from them, you give it to me and make yours, and I'm gonna make mine on the other end, because there's a lot of – that way there's more meat on the bone. Just like with the other thing, anything you do, you're gonna know, flat out. This is exactly what we paid for it, that's all, what we make is what we make.

(Ex. E (#60-10) at 5–6). Halgat immediately responded, saying: "I just had this conversation at length. I just had this conversation, and there is nothing good." (*Id.*) Halgat also stated that he was uncomfortable with the quantity Brancato requested and the extent to which Halgat would have control over the transaction: "[b]ut the thing is, is I don't know the extent – QP's big." (Ex. E (#60-10) at 2).

Later, on September 19, 2012, Brancato explained to his supervisors how he would split the quarter pound transaction into four smaller transactions, which together amount to the quarter pound of cocaine that Brancato originally wanted:

> Well, that's what I'm thinking. Well, this is what I'm thinking, bro is that on the QP, we do it the same way, let Maniac [–] I give Maniac the money, he goes in there, brings it back to me da, da, da. And then on the next one, I'm like hey, bro, can I just go to him direct and I'll still give you the money and now I have a sale of QP with him.

(Ex. 4 (#59-3) at 6).

Brancato ultimately executed this plan. Brancato contacted Halgat, told Halgat to contact Wickham, and gave Halgat money to pay Wickham as Brancato drove Halgat to meet Wickham. After

the second transaction, Wickham[17] directly told Brancato: "If you want to do another one tomorrow, we can." (Ex. 2 (#44-2) at ROI 169). This led to the third transaction. After the third transaction, Brancato directly told Wickham that Brancato wanted to complete a fourth transaction sometime the next week. (*See* Ex. 3 (#44-3) at ROI 171). Halgat's participation was superfluous.[18]

Finally, the third factor also weighs in Halgat's favor because the ATF decided over Halgat's protestations how much cocaine to traffic. When Brancato solicited a single quarter-pound transaction, Halgat said, "that'll be a problem," "[d]on't fuck with [it]," "[b]ut the thing is, is I don't know the extent – QP's big." (Tr. (#60-9) at 2–3); (Ex. E (#60-10) at 1–2). In both *Black* opinions, Judges Fisher, Gaber, Reinhardt, Noonan, and Chief Judge Kozinski agree that it is inappropriate for the ATF, rather than the defendant, to determine the amount of drugs trafficked. Judge Otis spoke eloquently on this point, saying: "[e]verything about the scheme—and therefore almost everything bearing upon a defendant's ultimate sentence—hinges solely on the Government's whim. Why were there not 10 kilograms in the stash house? Or 100? Or 1,000?" *Hudson*, 2014 WL 960860, at *11.

Possessing an eighth of an ounce of cocaine—the crime Halgat committed while under surveillance—is punishable by one year imprisonment and a $1,000.00 fine. *See* 21 U.S.C. § 844. By contrast, possessing a quarter-pound of cocaine with intent to distribute—the crime the ATF designed, and initiated—is punishable by up to twenty years imprisonment and a maximum fine of $1,000,000.00 *See* 21 U.S.C. § 841. *See also Black*, 733 F.3d at 317 (citing Brad Heath, *ATF Uses Fake Drugs, Big Bucks to Snare Suspects*, USA Today, June 28, 2013, at 1A) (according to the ATF's special operations chief, the sentence that the ATF seeks when investigating crimes is fifteen years).

---

[17] Wickham pled guilty on May 12, 2014. (*See* Mins. Proceedings #80).

[18] (*See also* Def.'s Mot. (#59) at 19:2–5) (stating that Brancato insisted that Halgat attend the transactions, just to have a beer, even though Halgat said that his participation was unnecessary and did not want to attend); (*accord* Gov't's Opp'n (#103) at 36:5–6) (stating that "there is no contested issue of fact" before the court).

Therefore, this factor weighs heavily in Halgat's favor. *See Smith*, 924 F.2d at 897 (stating that the government engages in outrageous conduct when it engineers and directs the crime from start to finish).

### 4.  The Government's Encouragement of the Defendants

The fourth *Black* factor considers the government's encouragement of the defendants. In *Black*, the court stated that this factor requires a sliding scale analysis: "[t]he extent to which the government encouraged a defendant to participate in the charged conduct is important, with mere encouragement being of lesser concern than pressure or coercion." *Black*, 733 F.3d at 308. Here, there is no doubt that Brancato pressured Halgat into participating in the cocaine transactions.

The government argues that this factor favors the ATF because the government may use friendship, sympathy, and even sexual foreplay[19] to ferret out crime. (Gov't's Opp'n (#103) at 22:4) (citing *United States v. Simpson*, 813 F.2d 1462, 1466 (9th Cir. 1987); *United States v. Slaughter*, 891 F.2d 691, 696 (9th Cir. 1989). In *Simpson* and *Slaughter*, the Ninth Circuit stated that "[t]o win a suspect's confidence, an informant must make overtures of friendship and trust and must enjoy a great deal of freedom in deciding how best to establish a rapport with the subject." *Slaughter*, 891 F.2d at 696 (citing *Simpson*, 813 F.2d at 1466). Accordingly, the Ninth Circuit upheld the use of sexual foreplay in *Simpson* because it was merely a lie that was used to gain the suspect's trust. *Simpson*, 813 F.2d at 1465–66 (stating that the agent used "sex to deceive him into believing she was an intimate friend just so she could lure him into selling heroin" and describing the ruse as a mere "deceptive creation," "artifice" and type of "deceit").

---

[19] The government argues that the Ninth Circuit condoned the use of sex in *Simpson* to ferret out crime. It did not. As noted, both parties admitted "that they engaged in sexual foreplay, but the testimony is in conflict as to whether they also engaged in sexual intercourse." *Simpson*, 813 F.2d 1462, 1465 n. 3.

*Simpson* is not comparable to Halgat's case. Here, the lie that was used to gain Halgat's trust was that Brancato and the confidential informant were from the same neighborhood. This ruse enabled Brancato to infiltrate Vagos, befriend Halgat, and become a Vagos "brother." In *Simpson*, after trust was established, the government "set its bait" and the suspect readily sold narcotics "without further inducement by the government." The government's conduct was different here. After Brancato became Halgat's "brother," Brancato set the bait on August 10, 2012 and Halgalt immediately rejected it. Later that evening, Brancato set the bait again and Halgat said, "fuck this thing," "I can't. . . I can't fucking – I can't help," and, "I had a wakeup call one day."

Five weeks later, on September 19, 2012, Brancato set the bait again. But, Halgat only took part: he agreed to offer an introduction to a third party who was not a member of his gang—not to traffic cocaine as the government requested. When the transaction ended, Brancato tried to convince himself that Halgat sold him the cocaine, saying: "[T]his is what I'm thinking. Like as far as I'm concerned fucking Maniac [i.e., Halgat] sold me this fucking ounce, bro. I mean, really. Yeah. Well, that's what I'm thinking." (Ex. 4 (#59-3) at 6). Brancato then described how he would structure future transactions to implicate Halgat. (*See id.*)

This is unlike prior cases where the government "sets the bait" and the suspect immediately "responds without further inducement by the government." *Black*, 733 F.3d at 306 (citing *United States v. Bagnariol*, 665 F.2d 877, 882 (9th Cir. 1981). In *United States v. Sapper*, Judge Dorsey denied a motion to dismiss for outrageous government conduct where the defendant solicited sex on Craigslist, a government agent posing as a fourteen year old girl responded, and the defendant pursued the putative girl for sex despite her repeated admonitions that she was indeed a minor. *Sapper*, No. 2:12–cr–00435–JAD–CWH, 2013 WL 4857775, at *7–*8 (D. Nev. Sept. 10, 2013).

The government's conduct is also unlike *Black*, where—after a ruse established trust between a covert agent and the defendants—the defendants immediately "responded with enthusiasm. They were eager to commit the fictional stash house robbery." *Black*, 733 F.3d at 307. The government's conduct is also unlike *Bagnariol*, where the ATF posed as So-Cal, a fictitious California corporation interested in legalizing gambling in Washington. *Bagnariol*, 665 F.2d at 880. A covert government agent met with the defendant lobbyist, who—without further inducement by the government—assured the agent "that he could advance So-Cal's interest through 'modern corporate ways' rather than 'old fashioned thug ways,' stating, 'You don't buy people anymore, you rent 'em." *Id.* at 881.

The fourth factor also weighs in Halgat's favor because Brancato exploited Halgat's indigence. When Brancato first solicited a quarter pound of cocaine, he stated:

> Yeah, but, you know what, homey, sometimes you have to take a risk, you know. Times are hard right now, homey. [. . .] Times are hard for everybody. [. . .] —and for me, right now, it's worth the risk. [. . .] And for everybody, you know, everybody's hurting.

(Tr. (#60-9) at 2–3). He repeated this again, saying: "I'm not trying to be – hey I'm not trying to be Hugh Hefner bro, I just want to get, you know, a little meat on the bone for everybody, because I'll make it on the other end." (Ex. E (#60-10) at 1–2). And, again: "It's hard for me to turn down, you know, a little bit of meat on the bones, and if everybody's happy, and everybody makes a little bit, then that's good for me, and I feel good about myself, and then they're really happy over there." (Ex. E (#60-10) at 5–6).

Judge Reinhardt characterized similar behavior by the ATF as "offensive to the constitution" and explained that "[a]t the right moment and when described in attractive enough terms, such offers may lead astray otherwise abiding young men. . . ." *Black*, 750 F.3d at 1056. Here, Halgat appeared resolute against trafficking drugs until Brancato exploited the defendants' socio-economic vulnerability:

29

| Brancato: | Times are hard for everybody. |
|---|---|
| Male Voice: | I can [*whistling sound*]. |
| Brancato: | Yeah, but as long as, you know, and if they don't know and— |
| Male Voice: | I'll just— |
| Brancato: | —and for me, right now, it's worth the risk. |
| Male Voice: | Damn. |
| Brancato: | And for everybody, you know, everybody's hurting. |
| Male Voice: | Yeah? |
| Brancato: | Can we do something? |
| Male Voice: | [*unintelligible*] |
| Brancato: | Alright, we'll talk. |
| | [*Sound of a motorcycle engine*] |
| Male Voice: | Hey, I got it. |

(Tr. (#60-9) at 2–3).

The government may use lies, artifice, stratagem, and sexual foreplay to build trust and ferret out crime. *United States v. Ramirez*, 710 F.2d 535, 541 (9th Cir. 1983) (citing *Sorrells v. United States*, 287 U.S. 435, 441 (1932)). But, Halgat's refusal to traffic cocaine was not the product of the government's ruse. It was real.[20] Similarly, the government's use of Halgat's indigence was not a stratagem designed to reveal ongoing crime. It was the use of pressure designed to create crime. Accordingly, the government's conduct exceeded mere encouragement.

### 5.   The Government's Participation on the Crime

The fifth *Black* factor considers the government's participation in the crime. *Black*, 733 F.3d at 308–09. Here, the court's inquiry focuses on three subfactors: (1) the duration of the government's participation in the crime; (2) the nature of the government's participation; and (3) the necessity of the government's participation in the crime. *Id.* The fifth *Black* factor also weighs in Halgat's favor.

The court begins with the first subfactor. The longer the government participates in a criminal enterprise, the greater the court's concern. *Id.* (citing *Green*, 454 F.2d at 786 (finding outrageous government conduct where the government's investigation lasted three years). Here, the ATF's

---

[20] (*See* Gov't's Opp'n (#103) at 36:5–6) (stating that "there is no contested issue of fact" before the court.)

investigation began in April 2010. Over two years later, the ATF's investigation yielded the following facts: Halgat once trafficked drugs but since repudiated the practice. When the investigation ended on June 19, 2013—over three years after it began—the ATF searched Halgat's home and workspace but found nothing. Immediately afterwards, Halgat drove from California to Nevada to surrender himself to the U.S. Marshalls.

The government argues that the relevant timeframe does not span from April 2010, when Operation Pure Luck began, to June 19, 2013, when the operation ended. (*See* Gov't's Opp'n (#103) at 26–27). It proposes limiting the time frame from August 10, 2012, when Brancato first solicited cocaine from Halgat, to October 22, 2012, when the fourth transaction occurred. (*Id.*) The court disagrees. The court must consider the totality of the circumstances. *Black*, 733 F.3d at 304 n. 7. If the court limits its inquiry from August 10, 2012 to October 22, 2012, then it omits several facts that are important to both the defense and prosecution, including: (1) ATF intelligence demonstrating that Halgat never trafficked cocaine while under surveillance; (2) ATF intelligence demonstrating that Halgat bought cocaine two times in three years for personal use; and (3) Halgat's statements that he did, in fact, traffic drugs but had repudiated the practice.

The second subfactor examines the nature of the government's participation: "whether the government acted as a partner in the criminal activity, or more as an observer of the defendant's criminal conduct." *Black*, 733 F.3d at 308. This subfactor strongly weighs in Halgat's favor. As discussed above, (1) the transactions were Brancato's idea, (2) Brancato initiated the transactions, (3) Brancato told his supervisors how he would structure the transactions, and (4) Wickham and Brancato knew that the

transactions were between Wickham and Brancato, not Wickham, Brancato, and Halgat.[21] Therefore, the fifth *Black* factor heavily favors Halgat.[22]

### 6.    The Need for the Investigative Technique

The final *Black* factor considers "the need for the investigative technique that was used in light of the challenges of investigating and prosecuting the type of crime being investigated." *Black*, 733 F.3d at 309. The government argues that this factor should weigh in its favor because "[a]pphrending criminal gang members is difficult; in order to do so agents often must infiltrate the organization by going undercover for years at a time." (Gov't's Opp'n (#103) at 24:13–15). This argument is misplaced. The government's infiltration poses no problem. Brancato and the confidential informant invented an appropriate ruse and obtained valuable information regarding several criminal defendants, including Wickham and other members of Vagos. *See United States v. Kane*, et al., No. 13–cr–250–JAD–VCF (D. Nev. 2013) (prosecuting Halgat's Vagos cohorts for different crimes).

The problem is that the government's investigation deployed techniques that generated a wholly new crime for the sake of pressing criminal charges against Halgat. In *United States v. Twigg*, the government directed an informant to call the defendant with whom the informant previously manufactured speed. *Bagnariol*, 665 F.2d at 882–83 (citing *Twigg*, 588 F.2d 373). The government told the informant to suggest establishing a laboratory to manufacture more speed. *Id.* The government provided the chemicals, the equipment, and the site. *Id.* The informant was in complete charge of the

---

[21] After the second transaction, Wickham directly told Brancato: "If you want to do another one tomorrow, we can." (Ex. 2 (#44-2) at ROI 169). This led to the third transaction. After the third transaction, Brancato directly told Wickham that Brancato wanted to complete a fourth transaction sometime the next week. (*See* Ex. 3 (#44-3) at ROI 171).

[22] The third subfactor considers the necessity of the government's participation in the crime and "whether the defendants would have had the technical expertise or resources necessary to commit such a crime without the government's intervention." *Black*, 733 F.3d at 308. This subfactor is inapplicable because technical expertise was not an issue in the alleged crime.

production process. *Id.* The defendant's assistance was minimal and at the specific direction of the informant. *Id.* Despite the defendant's clear predisposition, his conviction was reversed. *Id.* The Third Circuit stated:

> This egregious conduct on the part of the government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred.

*Id.*

The government's conduct is more egregious here. Halgat previously trafficked drugs but disavowed it. Then, Brancato appeared. Brancato asked Halgat to traffic illegal guns. Halgat refused. Brancato asked Halgat to traffic cocaine. Halgat refused. Brancato applied pressure, supplied money, designed the plan, initiated four transactions, and falsified a report regarding one of the transactions. After five weeks of refusal, Halgat capitulated and agreed to participate at a minimal level. He reluctantly provided a contact and then followed Brancato's script by getting in Brancato's car, taking the ATF's money, and subsequently handing it to Wickham. *See Smith*, 924 F.2d at 897 (stating that the government engages in outrageous conduct when it engineers and directs the crime from start to finish).

This shaped Halgat's known criminal propensity—buying an eighth of an ounce of cocaine for personal use—into a new and different crime: possessing a quarter pound of cocaine with intent to distribute.[23] The indictment should be dismissed. *See Black*, 750 F.3d at 1059 (citing *Williams*, 547 F.3d at 1199; *Bonanno*, 852 F.2d at 437–38) (stating that the government engages in outrageous conduct

---

[23] Possessing an eighth of an ounce of cocaine is punishable by one-year imprisonment and a $1,000.00 fine. *See* 21 U.S.C. § 844. By contrast, possessing a quarter-pound of cocaine with intent to distribute is punishable by up to twenty-years imprisonment and a maximum fine of $1,000,000.00 *See* 21 U.S.C. § 841. *See also Black*, 733 F.3d at 317 (citation omitted) (according to the ATF's special operations chief, the sentence that the ATF seeks when investigating crimes is fifteen years). The ATF has no authority over illicit drugs.

when it "uses artifice to cause a crime and to shape the nature and planning of that crime while targeting people who are not already known to be involved in a continuing series of similar crimes."); *United States v. Sherman*, 356 U.S. 369, 372 (1958) ("[T]he function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime.").

ACCORDINGLY, and for good cause shown,

IT IS ORDERED that the court's July 23, 2014 hearing (#106) is VACATED.

IT IS FURTHER ORDERED that the government's motion for leave to file a response exceeding thirty pages (#102) is GRANTED.

IT IS FURTHER ORDERED that the government's motion to strike (#64) is DENIED.

IT IS FURTHER ORDERED that the parties' stipulation to extend time to file an opposition (#97) is GRANTED.

IT IS FURTHER ORDERED that the parties' stipulation to extend time to file a reply (#107) is DENIED AS MOOT.

IT IS RECOMMENDED that Jeremy Halgat's motion to dismiss (#59) be GRANTED.

IT IS SO RECOMMENDED.

DATED this 15th day of July, 2014.

CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE

34