1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

UNITED STATES OF AMERICA,

Plaintiff,

v.

JEREMY HALGAT, et al.,

Defendants.

Case No. 2:13-CR-00241-APG-VCF

**ORDER REJECTING REPORT & RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO DISMISS**

(Dkt. ##59, 108)

The Government successfully infiltrated the Vagos Motorcycle Club to determine whether it was engaged in illegal conduct. Defendant Jeremy Halgat was a member of the Vagos. At the conclusion of the investigation, Halgat was indicted in this case on four counts of distribution of cocaine and one count of conspiracy to distribute. (Dkt. #1.)[1] Halgat moved to dismiss the indictment, alleging that it was the result of "Outrageous Government Conduct."[2] (Dkt. ##59, 93.) Halgat contends that he was not predisposed to commit the crimes and that the Government's agent created and encouraged the crimes, bullied Halgat into participating, and oversaw the crimes from start to finish. The evidence presented at the hearing on the motion refutes Halgat's

---

[1] Halgat also was indicted in Case No. 2:13-cr-00239-JAD-PAL in connection with a reverse sting operation created during the same investigation of the Vagos. Halgat filed nearly-identical motions to dismiss in both cases. Thus, Judge Dorsey and I held a joint evidentiary hearing on the motions. (*See* Dkt. #132.)

[2] During the evidentiary hearing on the motion, Halgat stipulated to withdraw the portion of his motion alleging the Government purposely edited or tampered with the audio recordings. (Dkt. #171 at 5-11.) I hereby approve the parties' written stipulation (Dkt. #164) withdrawing that portion of the motion.

allegations and demonstrates both that Halgat was a willing participant in the drug purchases and that the Government's actions were reasonable. Therefore, I deny Halgat's motion.[3]

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

The Government's "Operation Pure Luck" was designed to infiltrate the Vagos Motorcycle Club and determine whether it was a criminal enterprise and whether its members were engaging in criminal activity. Agostino Brancato was a Los Angeles County Sheriff's Deputy and Bureau of Alcohol, Tobacco, Firearms and Explosives Task Force Officer (TFO). In approximately September of 2011, Brancato joined the Vagos in Las Vegas, acting in an undercover capacity. (Dkt. #168 at 41.) It took him until July 1, 2012 to progress through the Vagos ranks from "Hang Around" status, through "Prospect" status, to become a "Full-Patch Member." (*Id.* at 41-42.)

Defendant Jeremy Halgat was a Full-Patch Member of Vagos, and he held a leadership role within Vagos.[4] Brancato became friendly with Halgat and his family and regularly interacted with Halgat and other Vagos members. Although Halgat had no documented criminal history (Dkt. #168 at 42-43), he repeatedly bragged to Brancato about his prior criminal exploits, including stomping a Hell's Angels member in Sparks, Nevada (Dkt. #170 at 122-123), attempting to assault members of rival motorcycle clubs (*Id.* at 119-120), firing a weapon in the backyard of a New Year's Eve party (Dkt. #170 at 121), transporting marijuana and live grenades across the Mexican border (*Id.* at 125, 129-130), and having $35,000 worth of marijuana stolen from him (*Id.*). Halgat claimed that "he had a couple of close calls with law enforcement during his previous work as a drug courier." (*Id.*) He told Brancato that he could convert assault rifles into fully-automatic weapons. (*Id.* at 136-137.) Halgat wore Vagos patches signifying that he had

---

[3] I express no opinion about the Government's actions in connection with the "street theater" portion of Operation Pure Luck, as those events are unrelated to the Indictment in this case. Rather, they are part of Judge Dorsey's case.

[4] At some point during the operation, Halgat was demoted from a Full-Patch Member to a Prospect.

committed violence on behalf of both his Vagos chapter and the overall Vagos organization (Dkt. #170 at 116-118, Dkt. #169 at 9-10), thereby corroborating some of his boasts.

Brancato witnessed Halgat committing criminal activity, including the purchase, distribution, and consumption of narcotics. (Dkt. #170 at 109, 111-112, 41-143, 146-152.) Brancato was with Halgat when Halgat purchased cocaine from defendant Udell Wickham. (Dkt. #170 at 109, 141-143.) Brancato ultimately determined that Halgat had a criminal disposition, and Brancato wanted to trace Halgat's drug supply chain higher up past Wickham. (Dkt. #170 at 156; Dkt. #171 at 63-65.)

Brancato asked Halgat how he could purchase a quarter pound of cocaine from Wickham. Halgat expressed concern about actively participating in the transaction, but he agreed to make introductions between Brancato and Wickham and vouch for each of them. (Dkt. #168 at 104-114; *see also*, Defs. Exh. 619 and 697 (audio tapes); Defs. Demonstrative Exh. 586 at 5-6; Govt. Demonstrative Exh. 5 at 60-61.) Within the next few weeks, Halgat arranged for a meeting with Wickham on September 11, 2012 at the Crowbar. At that meeting, after some small talk between the three men, Halgat and Wickham went to another spot in the Crowbar and negotiated the purchase of a quarter pound of cocaine for $2,800 on a future date. (Dkt. #170 at 157-159.)

On September 19, 2012, Halgat informed Brancato that Wickham required the entire $2,800 purchase price paid in advance. (Dkt. #170 at 158-166.) Brancato was unwilling to front that much cash, so he asked to purchase a smaller amount that day. (*Id.*) Halgat relayed the message to Wickham and Wickham agreed. (*Id.*) Later that evening, Brancato and Halgat drove together to a Hooters restaurant where Halgat had arranged with Wickham to conduct the sale. (*Id.* at 166-167.) While driving to the restaurant, Brancato gave $800 to Halgat for the purchase. At the restaurant, the three discussed purchasing a quarter pound of cocaine in the future, and Wickham agreed to sell an ounce for $700 that day. (*Id.*; *see also* Exh. 620 (audio recording).) Eventually, Halgat and Wickham went to the restroom and exchanged the money for an ounce of cocaine. (*Id.*) Halgat gave Brancato the cocaine during the drive home. (Dkt. #168 at 134-137.)

Halgat and Brancato made three more one-ounce purchases of cocaine from Wickham on October 11, 12, and 26, 2012.  Each time, Halgat was an active participant in the transactions, handing over the money and/or accepting the cocaine.  During this time, Brancato repeatedly asked Halgat if he could deal directly with Wickham. (Dkt. #171 at 63-65.)  Halgat never allowed that to happen, so Halgat was directly involved in all four purchases. (*Id.*)

Operation Pure Luck continued for months after these four purchases and resulted in several indictments.  In this case, Halgat and Wickham were indicted on four counts of distribution of cocaine and one count of conspiracy to distribute.  Wickham pleaded guilty to all five counts without the benefit of a plea agreement with the Government. (Dkt. #80.)  Halgat moved to dismiss the indictment, alleging "Outrageous Government Conduct."  After the motion was fully-briefed, Magistrate Judge Ferenbach recommended that the motion be granted. (Dkt #108.)  The Government objected to that recommendation. (Dkt. #114.)

Pursuant to Local Rule IB 3-2, I have conducted a *de novo* review of the issues set forth in Magistrate Judge Ferenbach's Report & Recommendation and the related briefs.  In connection with that review, I and Judge Dorsey convened a joint evidentiary hearing on the motions filed in this case and in the related Case No. 2:13-cr-00239-JAD-PAL.  For the reasons set forth herein, Magistrate Judge Ferenbach's Report & Recommendation is rejected, and Halgat's Motion to Dismiss is denied.

## ANALYSIS

**1.   The Bases for Magistrate Judge Ferenbach's Recommendation**

Magistrate Judge Ferenbach's recommendation of dismissal is based in large measure on his findings that (1) Halgat had repudiated his prior drug-dealing activities and refused to participate in the drug transactions, (2) Brancato unduly pressured Halgat into participating, and (3) Brancato lied in at least one Report of Investigation. (Dkt. #108 at 6-10 & 21, n.15.)  Magistrate Judge Ferenbach's findings were made without the benefit of an evidentiary hearing.  He initially scheduled a hearing but canceled it after the Government—apparently overly optimistic about its position—stated in its response to the motion that "arguments raised in

[Halgat's] motion do not rise to the level of necessitating an evidentiary hearing as there is no contested issue of fact." (Dkt. #103 at 36:5-7.)  Magistrate Judge Ferenbach interpreted the facts and allegations differently than the Government, and he believed the Government conceded that "Halgat's refusal to traffic cocaine [with Brancato] was real." (Dkt. #108 at 30, n. 20.)

Instead of an evidentiary hearing, Magistrate Judge Ferenbach relied on transcripts of video and audio tapes that were submitted by Halgat's expert.  The Government submitted transcripts that differed from Halgat's, but Magistrate Judge Ferenbach accepted Halgat's versions as correct and that affected his decision.  Magistrate Judge Ferenbach found that Halgat initially refused to help Brancato purchase cocaine because Halgat had unequivocally repudiated his prior drug dealing activities. (*Id.* at 7-9 & 20.)  Magistrate Judge Ferenbach also found Brancato's repeated pressure upon Halgat over five weeks overcame Halgat's initial refusal. (*Id.* at 10.)

At the evidentiary hearing, the parties played audio and video recordings of the relevant events and offered their differing transcripts of those recordings.  Many of the recordings are of poor quality and difficult to decipher.  Halgat's transcripts misidentify speakers and misquote what is being said. (*Compare* Defs. Demonstrative Exh. 586 at 5-6 *with* Dkt. #168 at 104-114, 124, 128, 142-143 *and with* Dkt. #170 at 41-43.)  More importantly, Halgat's claim that he refused to participate in the sale because he had repudiated his former drug dealing is belied by the evidence presented at the hearing, including the recordings and the transcripts.  For instance, while discussing the possibility of working with Brancato to purchase the quarter pound of cocaine, Halgat stated:

> I did this for a long time, and I used up all my luck.  I know that for a fact, so the only thing I can contribute is, hey this my home boy, I trust him.  This is my home boy, I trust him, whatever you do, . . . . It's trust – understand.

(Dkt. #168 at 104-114; *see also*, Defs. Exh. 619 & 697 (audio tapes); Defs. Demonstrative Exh. 586 at 5-6; Govt. Demonstrative Exh. 5 at 60-61.)  Rather than refusing to assist in the drug sale, Halgat agreed to assist by making an introduction between Brancato and Wickham and vouching

for both of them to each other. (*Id.* ("the only thing I can contribute is, hey this is my home boy, I trust him").)

According to Halgat's transcript, Halgat next said "I can't fucking.  I can't help. . . ." (Defs. Demonstrative Exh. 586 at 6.)  The Government's transcript is slightly different, with Halgat saying "I can't (unintelligible).  I can't have . . . ." (Govt. Demonstrative Exh. 5 at 61.) Brancato repeatedly testified that Halgat's transcript is incorrect. (Dkt. #168 at 114, 124, 128, 142-143.)  He specifically testified that this portion is inaccurate and that Halgat never said "I can't help." (*Id.* at 142-144.)  The recording is difficult to hear, but it appears to match the Government's version. (*See* Defs. Exhs. 619 & 697 (audio tapes).)  The Government's interpretation also seems more logical, especially in the context of the overall conversation. Seconds before, Halgat had offered to make introductions and vouch for Brancato and Wickham, so he would not have immediately thereafter said "I can't help."  Rather, it appears Halgat was telling Brancato that he would not be directly involved in the purchase of a quarter pound of cocaine, but that he would facilitate by vouching for the two participants he knew: Brancato and Wickham.[5]

While I believe the Government's transcripts are more accurate than Halgat's, for purposes of this motion the differences are not critical because in both transcripts Halgat agreed from the outset to assist the purchase through introductions and vouching.  Subsequently, Halgat went further by fully participating in the transactions.  He also rejected several opportunities to remove himself from the criminal activities when he refused to allow Brancato to contact and purchase directly from Wickham.

Magistrate Judge Ferenbach also found that Brancato falsified portions of his Report of Investigation about the first drug transaction. (*Id.* at 21, n.15.)  Again, he made this finding

---

[5] This is consistent with Halgat's statement a few seconds later that during his prior drug dealing, he grew tired of being used as "a pistol" and a "bomb" for higher ups. (Defs. Demonstrative Exh. 586 at 6, Govt. Demonstrative Exh. 5 at 62.)   Thus, while he may have not wanted to be an active participant in the sale of a large amount of cocaine, he apparently was willing to facilitate Brancato's purchase through introductions and vouching.

without the benefit of an evidentiary hearing, and that affected his decision. At the evidentiary hearing that was ultimately convened, Brancato offered credible explanations for the perceived contradictions and issues that Magistrate Judge Ferenbach found "distressing." (*See, e.g.*, Dkt. #171 at 63-68.) He also rebutted Halgat's allegation that the report was falsified. (*Id.*)

The benefit of the evidentiary hearing to resolving these issues cannot be understated. I was able to compare the transcripts with the recordings, listen to Brancato's explanations, evaluate his demeanor while testifying, and weigh his credibility. "There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility." *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995). *See also United States v. Thoms*, 684 F.3d 893, 904 (9th Cir. 2012) *cert. denied*, 133 S. Ct. 1477, 185 L. Ed. 2d 366 (2013) ("The strong presumption in our system is that demeanor evidence has important value. . . . Put another way, before a district court calls a police officer a liar, there is a strong presumption that the judge should look him in the eye first.").

I found Brancato's testimony to be truthful. His explanations of the issues that concerned Magistrate Judge Ferenbach made sense in the context of this case. Had the Government not argued in its response that there were no issues of disputed fact, Magistrate Judge Ferenbach likely would have conducted an evidentiary hearing. Instead, his Report & Recommendation is based on unsupported allegations of falsification and Halgat's faulty transcripts of recordings. Ultimately, it is up to the jury to decide who said what during the recorded conversations, whether Brancato is credible, and whether Halgat actually and voluntarily participated in the drug transactions for which he has been indicted. At this stage, I find the Government's transcripts to be more accurate and Brancato's testimony at the hearing to be reliable.

## 2. Outrageous Government Conduct

The notion that an indictment can be dismissed for outrageous government conduct is rooted in the due process clause of the Fifth Amendment of the Constitution, which provides that "no person shall . . . be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. Outrageous government conduct occurs when the actions of law enforcement

officers or informants are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973).

Dismissal for outrageous government conduct is "limited to extreme cases" in which the defendant can demonstrate that the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011). This is an "extremely high standard." *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (citing *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993)); *United States v. Simpson*, 813 F.2d 1462, 1465 (9th Cir. 1987) (quoting *United States v. Bogart*, 783 F.2d 1428, 1435 (9th Cir. 1986)) (finding that outrageous government conduct exists only in "'that slim category of cases in which the police have been brutal, employing physical or psychological coercion against the defendant'")). The standard is so high that only two federal appellate decisions have reversed convictions for outrageous government conduct. *Black*, 733 F.3d at 302 (citing *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) and *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971)).

Each case must be decided on its own facts, but outrageous government conduct occurs when "government agents . . . 'engineer[] and direct[] a criminal enterprise from start to finish.'" *Black*, 733 F.3d at 302 (quoting *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008)). Similarly, the government acts outrageously when it uses "'excessive physical or mental coercion' to convince an individual to commit a crime," (*Id.* at 302 (quoting *United States v. McClelland*, 72 F.3d 717, 721 (9th Cir. 1995))), or when the government generates "'new crimes merely for the sake of pressing criminal charges.'" *Id.* at 302 (quoting *United States v. Emmert*, 829 F.2d 805, 812 (9th Cir. 1987)).

On the other hand, it is not *per se* outrageous for law enforcement to infiltrate a criminal organization, approach people who are already involved in or contemplating a criminal act, or provide necessary items to a conspiracy. *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985). Nor is it necessarily outrageous for the government to "use artifice and stratagem to ferret out

criminal activity." *United States v. Bogart*, 729 F.2d 1428, 1438 (9th Cir. 1986).  "Government agents often need to play the role of criminals in order to apprehend criminals, and this role occasionally entails unseemly behavior." *United States v. Mosley,* 965 F.2d 906, 910 (10th Cir. 1992).

In *Black*, the Ninth Circuit reviewed prior case law and

> identified [the following] factors as relevant to whether the government's conduct was outrageous: (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

733 F.3d at 303.

### A.  Halgat's Known Criminal Characteristics and the Government's Individualized Suspicion of Halgat

These first two factors are closely tied together.  Halgat had no criminal record and held a concealed firearm permit.  However, he was a Full-Patch Member of, and held leadership positions in, the Vagos club.  Halgat repeatedly bragged to Brancato about his prior criminal exploits, including stomping a Hells Angel member in Sparks, Nevada (*Id*. at 122-123), firing a gun at a New Year's Eve party (Dkt. #170 at 121), transporting marijuana and live grenades across the Mexican border (*Id*. at 129-130), having $35,000 worth of marijuana stolen from him (*Id*.), and that "he had a couple of close calls with law enforcement during his previous work as a drug courier." (*Id*.)  Brancato witnessed Halgat commit crimes, including purchasing, distributing, and ingesting cocaine.  Halgat wore Vagos patches signifying he had engaged in violence on behalf of both his Vagos chapter and the overall Vagos organization (Dkt. #170 at 116-118, Dkt. #169 at 9-10), thereby corroborating his bragging.  These two factors weigh in the Government's favor.

### B.  The Government's Role in Creating the Crimes and its Encouragement of Halgat to Commit Them

The third *Black* factor examines whether the "government approached the defendant initially or the defendant approached a government agent, and whether the government proposed

the criminal enterprise or merely attached itself to one that was already established." 733 F.3d at 305.  The "infiltration of drug rings and a limited participation in their unlawful present practices . . . is a recognized and permissible means of investigation." *Russell*, 411 U.S. at 432.

The fourth *Black* factor focuses on the "extent to which the government encouraged a defendant to participate in the charged conduct," with "mere encouragement being of lesser concern than pressure or coercion." 733 F.3d at 308.  Courts have tolerated the government's use of friendship, sympathy, and even sexual foreplay to win a suspect's confidence. (*See* Dkt. #108 at 27-28 and cases cited therein.)

In *Black*, the government proposed a fictional stash-house robbery and initiated contact with the defendants. 733 F.3d at 307.  The defendants responded positively and helped plan the details of the robbery. *Id.* at 305.  Despite the government's initial role in creating the crime and assisting with its commission, the Ninth Circuit recognized that the defendants joined the conspiracy without significant inducement and took a role in planning the crime; thus, this factor did not weigh against the government. *Id.*

Magistrate Judge Ferenbach found no evidence in the record that Halgat planned and guided the cocaine purchases.  Rather, he believes that Brancato pressured Halgat over five weeks to overcome Halgat's initial protestations against the purchases. (Dkt. #108 at 24-26.)  As detailed above, Magistrate Judge Ferenbach's decision is based in large part on Halgat's transcripts of the relevant tapes—transcripts that contain numerous errors, including misidentifying speakers, and that are not as reliable as the evidence presented at the evidentiary hearing.  At the hearing, Brancato credibly explained what was happening during the recordings, and clarified who was speaking and what was said.  His explanations and the Government's transcripts match the audio recordings much better than Halgat's proffered transcripts.

Brancato had previously watched Halgat purchase cocaine from Wickham, and he asked to do the same thing.  For the crimes at issue in this case, the government did not stage an elaborate ruse.  Brancato began asking Halgat whether he, too, could purchase cocaine from Wickham.  While Halgat initially expressed some concerns about the purchase, he did not

strenuously oppose it.  Instead, he agreed to make introductions and vouch for both Brancato and Wickham. *See supra* at 3, 5-7.  Contrary to the story Halgat attempts to tell from the erroneous transcripts, Halgat quickly became a willing participant.  He arranged the meetings with Wickham.  He accompanied Brancato to each purchase.  And he conducted the exchanges. Moreover, Halgat had several opportunities to remove himself from the crimes.  For instance, Brancato repeatedly asked to deal directly with Wickham, but Halgat ignored those requests and continued to remain involved, in a sense controlling the relationship.  This confirms that Halgat was a willing participant, as he easily could have stepped aside.

Most importantly, Halgat presented no evidence to show that Brancato unduly pressured him—let alone did anything outrageous—to convince him to participate in the transactions. Brancato asked Halgat to help him with the drug purchase at least twice on August 10, 2012 and apparently a few times before the September 19 purchase.  But there is no evidence that Brancato exerted heavy pressure upon Halgat or coerced him into participating.  Rather, it appears that Brancato raised the issue, Halgat agreed to make introductions, and Halgat eventually decided to take the bait and involve himself in the transactions.  There is nothing outrageous about such conduct.  Based on the evidence presented at the hearing, Brancato's encouragement of Halgat in connection with the four drug transactions involving Wickham was not outrageous.

### C.  The Nature of the Government's Participation in the Offense Conduct, the Nature of the Crime Being Pursued, and the Necessity for the Actions Taken in Light of the Nature of the Criminal Enterprise at Issue

The fifth and sixth *Black* factors examine the Government's participation in the crime, particularly: (1) the "duration of the government's participation in [the] criminal enterprise," (2) the "nature of the government's participation—whether the government acted as a partner in the criminal activity, or more as an observer of the defendant's criminal conduct—including any particularly offensive conduct taken by the government during the course of the operation," (3) "the necessity of the government's participation in the criminal enterprise—whether the defendant would have had the technical expertise or resources necessary to commit such a crime without the government's intervention," and (4) the "need for the investigative technique that was

1    used in light of the challenges of investigating and prosecuting the type of crime being

2    investigated." *Black*, 733 F.3d at 308-309.

3         Brancato's infiltration of the Vagos took place over 22 months (August 2011- June 2013).

4    This was not an unduly lengthy period, given the closed nature of the Vagos club and how long it

5    takes for applicants to proceed through the screening process before becoming Full-Patch

6    Members. (Dkt. #170 at 97, 102-105, 107-108.)  No specific evidence was presented that

7    Brancato's activities prior to the four drug transactions with Halgat were improper or outrageous.

8    With regard to the drug purchases, Brancato first proposed purchasing cocaine in August 2012,

9    and the purchases occurred between September 19 and October 26, 2012.  This is a relatively

10   short period.

11        Brancato's participation in the purchases was not outrageous.  He requested the drugs and

12   provided the funds, but Halgat contacted Wickham and made the arrangements each time.  When

13   the government agent is "simply a purchaser or transmitter of contraband otherwise destined for

14   the market place," the government should not be held to have committed outrageous government

15   conduct. *United States v. Stenberg*, 803 F.2d 422, 431 (9th Cir. 1986).  These were simple

16   cocaine purchases similar to the purchases Halgat previously made from Wickham.

17        Similarly, the Government did not supply Halgat with technical expertise or resources he

18   did not already have.  Halgat had a pre-existing relationship with Wickham to obtain drugs, and

19   Brancato simply supplied the funds and opportunity to sell.

20        Finally, the techniques used by Brancato were reasonable in light of the investigation of

21   the Vagos club.  The Vagos club is a closed society in which entry is tightly guarded and

22   applicants are screened, investigated, and monitored over a lengthy period of time.  Brancato had

23   to become a Full-Patch Member of the Vagos to thoroughly investigate its activities.  Brancato's

24   actions were reasonable and necessary to infiltrate the Vagos.  With regard to the four drug

25   purchases, the techniques he employed were not unusual or overly sophisticated: he asked Halgat

26   to help him purchase drugs and he provided the funds.

27

28

The facts of this case are far less egregious than those in *Black*. The Government did not manufacture the crimes nor direct the criminal activities from start to finish. Brancato asked and encouraged Halgat to assist him in purchasing cocaine. Despite expressing some initial concerns, Halgat readily agreed to make introductions and vouch for Brancato and Wickham. Ultimately, Halgat both arranged and participated in the four drug purchases. He also resisted the opportunities to remove himself from the transactions and allow Brancato to deal directly with Wickham. There is no evidence that Brancato unduly pressured Halgat to become—or remain—involved.

Ultimately, it is up to the jury to decide who said what during the recorded conversations and whether Halgat actually and voluntarily participated in the drug transactions for which he has been indicted. At this stage, the evidence presented during the hearing on Halgat's motion convinces me that the Government did not engage in outrageous conduct. Considering all of the *Black* factors, the totality of the circumstances of this case does not warrant dismissal for outrageous government conduct.

### 3. The Court's Supervisory Powers

As an alternative to dismissing the indictment for outrageous government conduct, Halgat requests dismissal pursuant to my supervisory powers as a federal district judge. A judge may dismiss an indictment under his supervisory powers where: (1) the government violated a defendant's recognized right; (2) the government engaged in illegal conduct that must be deterred; or (3) there is evidence that a jury's verdict rested upon inappropriate considerations. *Black*, 733 F.3d at 310 n.12 (citing *United States v. Ramirez*, 710 F.2d 535, 541 (9th Cir. 1983)). The supervisory power "is commonly viewed as an inherent power to preserve the integrity of the judicial process." *Ramirez*, 710 F.2d at 541. "The power, however, has been infrequently utilized, . . . and a dismissal should be granted only when there is a clear basis in fact and law for doing so." *Id.* (citations omitted). Halgat has not established that the Government violated a recognized Constitutional or statutory right or engaged in any illegal conduct that must be deterred. Thus, dismissal under my supervisory powers is not warranted.

1

### CONCLUSION

2     **IT IS HEREBY ORDERED** that the Magistrate Judge's Report & Recommendation

3  (Dkt. #108) is rejected.  The parties' stipulation (Dkt. #164) is approved.  Halgat's Motion to

4  Dismiss (Dkt. #59) and Supplement (Dkt. #93) are **DENIED**.

5     Dated this 2nd day of January, 2015.

6

7     _____

8     ANDREW P. GORDON
      UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28